IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

**YUSNIER DE LA ROSA ESPINOZA,**

    **Petitioner,**

    v.                                                       CASE NO.  20-3126-JWL

**ROBERT GUADIAN, et al.,**

    **Respondents.**

## MEMORANDUM AND ORDER

This matter is a petition for writ of habeas corpus filed under 28 U.S.C. § 2241. Petitioner is detained at the Chase County Jail in Cottonwood Falls, Kansas ("CCJ"), pending removal proceedings. Petitioner alleges that his prolonged immigration detention without a bond hearing violates the Due Process Clause of the Fifth Amendment. Petitioner also alleges that the government's failure to protect his health and safety in light of the COVID-19 pandemic warrants his immediate release.

**I.  Background**

Petitioner is a native and citizen of Cuba. On or about March 28, 2019, he presented himself at the United States border at the Laredo, Texas port of entry. Petitioner was given a number to await processing and stayed at a church in Mexico until May 10, 2019, when he was taken into the custody of Customs and Border Patrol at the Laredo port of entry. Petitioner was given a Credible Fear Interview by an Asylum Officer. In that interview, the Officer found that Petitioner did have a credible fear of persecution if he were to be returned to Cuba.

Petitioner was found to be inadmissible into the United States pursuant to 8 U.S.C. § 1182(a)(7)(A)(i)(I) and was processed for Expedited Removal under 8 U.S.C. § 1225(b)(1).

(Declaration of Supervisory Detention Deportation Officer Daniel J. Byrd, Doc. 9–1, at 2.) Petitioner was provided with a List of Legal Services and was detained as an arriving alien.[1] *Id.* (citing INA § 235(b)(2)(A); 8 U.S.C. § 1225(b)(2)(A)). On May 12, 2019, Enforcement and Removal Operations ("ERO") took custody of Petitioner and placed him in the Rio Grande Detention Center, Laredo, Texas. *Id.* On May 25, 2019, Petitioner was transferred by ERO to the Caldwell County, Missouri Detention Center in Kingston, Missouri. *Id.* at 3.

Petitioner was issued a Notice to Appear before an immigration judge ("IJ") in Kansas City, Missouri, and had his first Master Calendar Hearing on July 2, 2019. The court gave him a continuance to file an I-589 Application for Asylum. On July 23, Petitioner appeared before the IJ via Video Teleconference for a master calendar hearing. (Doc. 9–1, at 3.) The court scheduled a merits hearing for July 31, 2019, to consider Petitioner's application. *Id.* At the July 23rd hearing, the IJ also addressed Petitioner's custody status, and entered an order denying Petitioner's release due to his status as an arriving alien subject to mandatory detention under 8 U.S.C. § 1225(b)(2)(A). *Id.* The IJ explained to Petitioner that if he wanted to appeal the bond decision, he had until August 22, 2019, to file an appeal. *Id.* Petitioner did not appeal the bond order. *Id.*

On July 31, 2019, the IJ heard Petitioner's testimony, denied his asylum application, and ordered his removal to Cuba. On or about August 2, 2019, the IJ issued a written decision. (Doc. 9–1, at 4.) On August 22, 2019, Petitioner timely appealed to the Board of Immigration Appeals ("BIA"). On January 15, 2020, the BIA remanded to the Immigration Court because the

---

[1] An arriving alien is defined as "an applicant for admission coming or attempting to come into the United States at a port-of-entry, or an alien seeking transit through the United States at a port-of-entry, or an alien interdicted in international or United States waters and brought into the United States by any means, whether or not to a designated port-of-entry, and regardless of the means of transport." 8 C.F.R. § 1.2.

merits hearing was scheduled eight days after the master calendar hearing rather than the required 14-day minimum. (Doc. 9–1, at 4.)

On or about January 30, 2020, Petitioner was transferred from the Caldwell County Jail to the CCJ, due to the suspension of the Caldwell County Jail's contract with ICE ERO. (Doc. 9–1, at 4.)  On March 4, 2020, Petitioner had a second individual hearing.  *Id*.  In a written decision dated March 9, 2020, the IJ denied his application for relief and ordered Petitioner removed to Cuba.  *Id*.  Petitioner timely appealed that denial to the BIA, and that appeal is still pending.

On April 3, 2020, Petitioner filed a request with ERO to be granted parole in lieu of being detained.  (Doc. 9–1, at 4.)  On April 6, 2020, Petitioner was served with notice that he would be given a parole board hearing on April 13, 2020. That notice further advised Petitioner that he would be given the opportunity to provide documents that would prove that he is not a flight risk, and listed examples of those documents.  *Id*.  On April 13, 2020, an ERO officer interviewed Petitioner regarding his parole request. *Id*. Petitioner answered questions regarding his family ties within the United States as well as sponsorship, if released on parole. Petitioner also answered questions relating to travel arrangements, amount of funding available, other non-familial community ties, criminal history, and proof of identity. Petitioner further provided documentation from a sponsor, Dalgis S. Casanova, a friend of Petitioner, relating to her ability to provide adequate housing, food, and other essentials for Petitioner if he were to be released. The documentation provided also included a reference letter, proof of the sponsor's legal residency, financial paperwork from the sponsor, and a copy of Petitioner's Cuban passport. Those documents showed a reported income (from the W-2's provided) of $4,911.92 in 2017 and $9,309.59 in 2018.  *Id*. at 5.  On April 14, 2020, based on the results of the interview and the

evidence provided, the interviewing officer recommended that the parole be denied. In his determination worksheet, the officer noted that several negative factors weighed against releasing Petitioner on parole including that Petitioner was a recent entrant to the United States, lacked substantial family ties, Petitioner's application for relief had been denied, he was ordered removed, and he has an appeal pending with the BIA.  Further, the reviewing officer noted that there was no public benefit or humanitarian reasons for release as Petitioner was not in need of extensive medical treatment, nor was he a key witness in an ongoing investigation. The officer's first-line supervisor reviewed the recommendation to deny parole and concurred with the recommendation. The recommendation to deny parole was forwarded to the Acting Assistant Field Office Director for final review.  *Id*.  On April 30, 2020, Petitioner's request for parole was denied.  *Id*.

Petitioner's appeal is currently pending before the BIA.  The BIA failed to supply Petitioner with the transcript for use in completing briefing on his appeal.  Petitioner received a reissued briefing schedule because he had not received the transcript.  As of the filing of his Traverse, Petitioner had still not received the transcript and was therefore unable to complete briefing on his appeal.  Petitioner's counsel was forced to seek another continuance of the briefing schedule and to file a "Motion to Issue Transcript" in hopes that the BIA will finally issue the transcript. (Doc. 11, at 1–2.)

Petitioner filed the instant Petition, seeking his immediate release due to the risk to his health and safety; or his release within fifteen days unless Respondents schedule a hearing before an immigration judge at which:  (1) to continue detention, the government bears the burden to show that Petitioner presents a flight risk or is a danger to the community and that no alternatives to detention could mitigate any risk that his release presents; and (2) if the government cannot

meet its burden, that Petitioner be released on appropriate conditions of supervision, considering that Petitioner is unable to pay any bond.  (Doc. 1, at 2, 18.)

## II. Discussion

To obtain habeas corpus relief, a petitioner must demonstrate that "[h]e is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2241(c)(3).  The federal district courts have habeas corpus jurisdiction to consider the statutory and constitutional grounds for immigration detention that are unrelated to a final order of removal.  *Demore v. Kim*, 538 U.S. 510, 517–18 (2003).

Petitioner raises two grounds for relief.  First, Petitioner argues that Respondents have abrogated their duty to provide for Petitioner's health and safety due to the COVID-19 pandemic, warranting his immediate release.  Next, Petitioner argues that his prolonged detention without a bond hearing violates the Due Process Clause of the Fifth Amendment.

### A.  Risk to Petitioner's Health and Safety

Petitioner argues that his continued detention threatens his safety and well-being because the CCJ has not taken adequate steps to ensure Petitioner's safety, nor that of the detained population at large, amid the global pandemic of COVID-19.  (Doc. 1, at 6–9.)  Petitioner alleges that an inmate exhibiting symptoms of COVID-19 was never tested nor treated for his ailments and continued to be in a cell next to the Petitioner; CCJ continues to accept new detainees and is not subjecting new arrivals to a quarantine period; and CCJ has not adjusted to the threat of an outbreak by taking measures such as increasing space between people in common areas or instructing the detainees on the practice of "social distancing."  *See* Petitioner's Declaration at Doc. 1–1.

Petitioner acknowledges that an attack on the conditions of confinement must be brought as a civil rights action, but argues that where release is the only effective remedy, a habeas petition is an appropriate vehicle to seek relief.  (Doc. 4, at 9.)  Petitioner then argues that civil detainees have greater rights in detention than criminal detainees.  *Id*.  Thus, Petitioner argues, although they should not be punished at all, the Eighth Amendment's prohibition on cruel and unusual punishment is illustrative.  *Id*; Doc. 1, at 16.

The Court recognizes that some courts have found that an argument regarding the conditions posed by COVID-19 must be brought in a civil rights action, while others have found that it is properly raised in a habeas petition.  *See, e.g., Archilla v. Witte*, No. 4:20-cv-00596-RDP-JHE, 2020 WL 2513648, at *19 (N.D. Ala. May 15, 2020) (noting that petitioners, who are seeking release from ICE custody due to the COVID-19 outbreak, are trying to shoehorn a conditions-of-confinement claim under section 2241); *cf. Ruderman v. Kolitwenzew*, Case No. 20-cv-2082, 2020 WL 2449758, at *7 (C.D. Ill. May 12, 2020) (finding that "[c]ourts across the country addressing similar claims of civil immigration detainees during the COVID-19 pandemic have found that such a claim can proceed in a habeas corpus petition) (collecting cases).  However, the Court finds that even considering Petitioner's arguments for immediate release due to the conditions posed by COVID-19, Petitioner has not shown that his immediate release is warranted in this case.

First, the Court notes that many courts have found that release is warranted due to a petitioner's particular vulnerabilities or health conditions.  *See, e.g., id*. at *13 ("while for most individuals, JCDC's measures would likely be more than sufficient to survive a due process challenge, Petitioner's unique medical conditions place him at an increased risk of serious illness or death"); *Fraihat v. U.S. Immigration and Customs Enforcement*, ___ F. Supp. 3d ___, 2020

6

WL 1932570, at *29, n.20 (C.D. Cal. April 20, 2020) (granting preliminary injunction and emergency motion to certify subclasses and defining risk factors as "being over the age of 55; being pregnant; or having chronic health conditions, including: cardiovascular disease . . .; high blood pressure; chronic respiratory disease . . .; diabetes; cancer; liver disease; kidney disease; automimmune diseases . . .; severe psychiatric illness; history of transplantation; and HIV/AIDS"); *see also ERO COVID-19 Pandemic Response Requirements*[2] (issuing guidance and directing the ERO field offices to review custody of the following subgroups: (1) pregnant detainees or those who have delivered within the prior two-weeks; (2) detainees over 60 years old; (3) detainees having any chronic illness that may make them immune-compromised, including but not limited to, blood disorders, chronic kidney disease, compromised immune systems, endocrine disorders, metabolic disorders, heart disease, lung disease, and/or neurological or neurodevelopmental disorders).

However, Petitioner has not alleged that he suffers from any underlying health concerns or vulnerabilities, and he appears to be a healthy, 33-year-old man. (Doc. 1–1, at 4.) When ERO officials interviewed Petitioner at the time of his entrance into custody in May 2019, he was asked about health issues and indicated to ERO that he was in good health and was not taking any medications. (Doc. 9–1, at 5.) Petitioner does not have any medical or psychiatric diagnoses that implicate the class or subclass defined in *Fraihat*. (Doc. 9–1, at 6.)

Lastly, the Court is not persuaded that the conditions at the CCJ warrant Petitioner's immediate release. While courts have ordered immediate release or have ordered that extra precautions be taken, in this case it appears that the CCJ is taking appropriate precautions. *See, e.g., Thakker v. Doll*, No. 1:20-cv-480, ___ F. Supp. 3d ___, 2020 WL 2025384 (M.D. Pa.

---

[2] https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsCleanFacilities.pdf.

April 27, 2020) (where immigration detainees each suffered from chronic medical conditions and faced an increased risk of death or serious injury if exposed to COVID-19, continuation of release was granted for three detainees at facility that already had 40 confirmed cases of the virus, and was denied for seven detainees who had committed violent offenses or were being held in facilities without any known cases of COVID-19, or facilities with enhanced prevention measures).

Larry Sigler, the Administrator at the CCJ, provided a declaration setting forth in detail the precautions in place at the CCJ, and declaring in relevant part that:

> Chase County, Kansas has seen only three COVID-19 cases, which equates to a case rate of 1.13 cases per 1,000 people, or 0.113%, as of May 15, 2020. . . . The Chase County Health Department has reported that all three of the positive COVID-19 cases in Chase County, Kansas have recovered. . . . Chase County Jail is a correctional facility located in Chase County, Kansas, and is capable of housing 150 inmates. There are currently 63 inmates housed at Chase County Jail, which represents 42% of Chase County Jail's capacity. There has been a reduction in the number of inmates housed at Chase County Jail since April 15, 2020, in an effort to limit inmate population due to the COVID-19 pandemic, and it is not anticipated that the inmate population will increase significantly in the foreseeable future. . . . Of the 63 inmates currently housed at Chase County Jail, 60 are immigration detainees and 3 are county inmates. The Chase County Jail has reduced the number of other counties from which it accepts inmates and now only accept inmates from Morris County, Kansas in addition to those inmates from Chase County. Beginning March 20, 2020, Chase County Jail adapted its procedures to limit the risk of COVID-19 exposure to inmates. Chase County Jail has been closed to the public and all inmate visitation privileges have been suspended since March 19, 2020. All inmate court appearances are conducted remotely via video from within a courtroom located in Chase County Jail in an effort to limit contact between inmates and people outside of the facility, and the courtroom is cleaned and sanitized between dockets. The only people who enter Chase County Jail, other than Chase County Jail staff members, are ICE agents bringing in detainees. The ICE agents are temperature checked upon entry to the building and wear masks at all times. Chase County Jail employs approximately 30 staff members,

including correctional officers, medical staff, and kitchen staff. Each staff member receives a medical screening upon arrival at Chase County Jail. The screening is conducted by medical personnel and includes a temperature check and questioning, consistent with CDC guidelines, to determine whether the employee displays any signs or symptoms of COVID-19. If an employee has a temperature of 100º or higher or shows any other signs or symptoms of COVID-19, the employee will be sent home to quarantine and all medical staff and inmates who have been in close contact with the potentially positive employee will continue to be screened.  Staff members wear masks at all times when in contact with inmates regardless of the length of time of the contact. Staff members also wear masks in confined areas with other staff members. Staff members have been educated regarding the signs and symptoms of COVID-19 and the importance of disinfecting communal spaces.  No Chase County Jail staff member or inmate has tested positive for COVID-19.[3]  Chase County Jail is divided into 1 open dorm that houses 20 inmates, 8 pods that each house 16 inmates, 1 pod that houses 4 inmates, and 5 segregated cells that each house 2 inmates. Restrooms and showers are located within the separated spaces and are not shared between inmates housed in different pods. Meals are served to inmates in their dorm or pod and no communal cafeteria is used.  The only facilities used by inmates outside of their pods are the recreation yard and the courtroom. Inmates of one pod do not use the recreation yard or the courtroom at the same time as an inmate from another pod and the areas are disinfected before and after access by members of different pods.  Beginning March 20, 2020, in response to the COVID-19 pandemic, Chase County Jail started a 14-day cohorting procedure for new inmates.[4]  When inmates arrive from another facility, instead of being housed with existing inmates as was the procedure prior to the COVID-19 pandemic, the group of new inmates is cohorted for at least 14 days. If 14 days pass without any inmate in the cohort showing symptoms of COVID-19, the inmates are removed from the cohort and housed with other inmates outside of the cohort. If one person in a cohort shows symptoms of COVID-19, the person will be removed from the cohort and placed in a segregated cell and the remaining cohort will remain isolated until 14 days passes without any inmate showing symptoms of COVID-19. Two pods of the nine pods at

---

[3]  Mr. Sigler notes in his declaration that "[o]ne employee has been tested for COVID-19 due to potential exposure. The employee was asymptomatic and tested negative.  Three inmates have been tested for COVID-19 and all tested negative.  As of May 18, 2020, no other employees or inmates have met the KDHE qualifications for testing." (Doc. 9–2, at 5 n.1.)

[4] "Cohorting refers to the practice of isolating inmates as a group to minimize interaction of individuals who may be infected or may have been exposed to COVID-19 from non-infected individuals."  *Id.* at 6, n.2.

> Chase County Jail are kept open for cohorting. In addition to screenings for COVID-19, each new inmate receives a full physical within the 14-day cohort period. The last inmate to arrive at Chase County Jail prior to initiation of the cohorting procedure arrived on March 10, 2020, and was placed in a pod on March 14, 2020. In the event an inmate within Petitioner's pod shows signs or symptoms of COVID-19, the inmate will be removed from the pod and placed in a segregated cell. The inmate will then be tested for COVID-19 and, if the results are positive, will remain separated from the other inmates until the inmate no longer poses a risk of infecting others. The remaining members of the pod will be continually screened for signs and symptoms of COVID-19. In the event the number of confirmed cases exceeds the number of segregated spaces available in Chase County Jail, ICE will be promptly notified so that inmates may be transferred to other facilities. Chase County Health Department has indicated COVID-19 tests are available and Chase County Jail has had no problem obtaining testing for the one employee and three inmates that have been tested. Medical staff at Chase County Jail consists of a registered nurse on duty from 7:00 a.m. to 3:00 p.m., Monday through Friday, and on call 24/7; a certified medical assistant on duty on the weekends; and a doctor on call daily until 10:30 p.m. Medical staff is present in each pod at least once each day to provide medication and care and to respond to any questions or health concerns of inmates. Opportunity for open dialog with medical staff is available when staff is present in the pods and an inmate need not make a special request to discuss questions or concerns. Medical care is also available to inmates upon request at times when medical staff is not present in the pod and inmates are encouraged to seek medical care if they fall ill. Notices furnished by ICE and printed from the CDC website in English and Spanish were posted in each pod on March 20, 2020. The notices provide recommendations to help prevent the spread of respiratory diseases like COVID-19 and guidance on how inmates can protect themselves from COVID-19.[] These notices include information about the importance of hand washing and hand hygiene, avoiding close contact with other people, covering coughs and sneezes with a tissue instead of hands, avoiding touching the eyes, nose, and mouth, and disinfecting commonly used surfaces. The notices also provide education regarding the symptoms of COVID-19 and encourage anyone showing the signs to seek medical attention.

(Doc. 9–2, at 1–8) (internal paragraph numbering and some footnotes omitted). The declaration further sets forth the availability of cleaning supplies, access to showers and laundry, and the

procedures available for requesting additional cleaning supplies or medical attention. *Id*. at 8–9. Inmates are also closely monitored by medical staff and screened daily for COVID-19, in addition to regular monitoring of other health conditions and medicine rounds. *Id*. at 9–10. Mr. Sigler also declares that he has reviewed the CDC and ICE ERO issued guidance to detention facilities to ensure that CCJ has complied in all relevant respects, and CCJ staff has identified all detainees that meet the CDC's identified populations potentially being at higher risk for serious illness from COVID-19 and notified both the ERO Field Office Director and Field Medical Coordinator of these detainees and their medical issues. *Id*. at 11. Petitioner does not fall within the CDC's identified populations potentially being at higher-risk for serious illness from COVID-19. *Id*. at 12.

Petitioner has not shown that the CCJ failed to take adequate steps to ensure Petitioner's health and safety in light of the COVID-19 pandemic. Furthermore, considering Plaintiff's health and his failure to show that he has underlying medical conditions that make him more vulnerable than the general population, his request for immediate release is unwarranted.

### B. Due Process Clause of the Fifth Amendment

Petitioner argues that the Due Process Clause of the Fifth Amendment requires that asylum seekers who are detained for an unreasonably long period of time be afforded an individual bond hearing. Petitioner argues that he has been detained in immigration custody since May 10, 2019, and during his detention, no neutral decisionmaker has conducted a hearing to determine if his lengthy detention is warranted due to him either being a danger to the community or a flight risk. Petitioner argues that he is detained in a criminal jail with similar restrictions as criminal detainees, such as restricted activities, highly regimented schedules, and limited meal service, laundry access, and library access. (Doc. 1, at 5–6.) Petitioner has not

been arrested for, charged with, committed or convicted of, any crime in the United States, and the only crime he has been accused of in Cuba was attempting to flee to seek asylum. (Doc. 1, at 13; Doc. 1–1, at 4.) Petitioner argues that even if Petitioner's removal order is upheld by the BIA and subsequent appellate courts, Petitioner's return to Cuba could be denied because Cuba has recently closed its borders to international flights. (Doc. 1, at 9) (citing Reuters, *Cuba suspends arrival of international flights to stop coronavirus*, March 31, 2020, *available at* https://reuters.com/article/us-health-coronavirus-cuba-borders/cuba-suspends-arrival-of-international-flights-tostop-coronavirus-idUSKBN21J41K). Petitioner argues that while some countries continue to accept deportees so they do not lose Visa privileges with the United States, Cuba has no Visa privileges with the U.S., so it has no incentive to open its borders specifically to deportees. *Id*.

Respondents argue that Petitioner is an arriving alien and under 8 U.S.C. § 1225(b)(2)(A) ERO is required to detain Petitioner until he is subject to a final order of removal. Respondents argue that detention under § 1225(b)(2)(A) is constitutional and although arriving aliens may be eligible for parole, an arriving alien has no right to a bond hearing. Section 1225(b)(2)(A) provides that "in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien *shall* be detained for a proceeding under section 1229a of this title." 8 U.S.C. § 1225(b)(2)(A) (emphasis added).

In *Jennings v. Rodriguez*, the Supreme Court held that §§ 1225(b)(1) and (b)(2) "mandate detention until a certain point and authorize release prior to that point only under limited circumstances." *Jennings v. Rodriguez*, 138 S. Ct. 830, 844–45 (2018) (stating that those subsections "mandate detention of aliens throughout the completion of applicable proceedings").

The Supreme Court held that the Ninth Circuit erred in concluding that periodic bond hearing are required under the immigration provisions at issue, and remanded for consideration of respondents' constitutional arguments. *Id*. at 851.

Petitioner does not argue that he has a statutory right to release or a bond hearing, rather he argues that his prolonged detention without a bond hearing is unconstitutional. The Due Process Clause of the Fifth Amendment provides that "[n]o person shall be . . . deprived of life, liberty or property without due process of law." U.S. Const. amend. V. Petitioner argues that multiple courts from other jurisdictions have held that these protections apply to noncitizens who are detained under 8 U.S.C. § 1225(b). However, this Court must follow the Tenth Circuit's guidance on this issue.

The court in *Gonzalez Aguilar v. Wolf*, addressed this issue considering Tenth Circuit case law. *See Gonzalez Aguilar v. Wolf*, No. 1:19-cv-0412 WJ/SMV, ___ F. Supp. 3d ___, 2020 WL 1429673 (D. N.M. March 24, 2020) (adopting magistrate judge's proposed findings and recommended disposition ("PFRD") to deny petition). In that case, the petitioner's Order of Release on Recognizance was revoked and she was detained under 8 U.S.C. § 1225(b)(2)(A) as an alien seeking admission into the United States. *Id*. at *1. Her requests for parole or to be released on her own recognizance were denied by DHS. *Id*. At the time of the decision, petitioner's appeal of the BIA's decision to the Tenth Circuit was pending and she remained in detention. *Id*. She filed a petition under 28 U.S.C. § 2241, arguing that her continued detention violates the Fifth Amendment's Due Process Clause, entitling her to either immediate release or an individualized bond hearing. *Id*. Respondents argued that petitioner had no Fifth Amendment right to release or a bond hearing, because she had not been admitted into the United States and was an "arriving alien." *Id*.

The court in *Gonazalez Aguilar* adopted the magistrate judge's PFRD, which recommended that the petition be denied "because Petitioner is an arriving alien, and as such, is owed only the procedural due-process protections as required by statute." *Id*. at *2. The magistrate judge analyzed the statutory structure applicable to the petitioner as an arriving alien, noting that § 1225(b)(2) "mandates the detention of aliens for removal proceedings if an immigration officer determines that the aliens are not entitled to be admitted to the United States," and explaining that:

> though the relevant immigration statutes permit the government to allow arriving aliens within U.S. borders—for example, by using the parole authority to permit an alien to live in the United States for humanitarian reasons—"such aliens are legally considered to be detained at the border and hence as never having effected entry into this country."

*Id*. (citation omitted). The magistrate judge concluded that no statutory provision compelled the petitioner's release or a bond hearing. *Id*.

Next, the magistrate judge addressed the reach of the Fifth Amendment Due Process Clause, by analyzing the case of *Shaughnessy v. United States ex rel. Mezei*, where the Supreme Court rejected habeas relief, emphasizing petitioner's status as an arriving alien. *Id*. (citing *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953)). "According to the Supreme Court, for an alien 'on the threshold of initial entry . . . 'Whatever the procedure authorized by Congress is, it *is* due process as far as an alien denied entry is concerned.'" *Id*. (citing *Mezei*, 345 U.S. at 212 (emphasis added)).

The magistrate judge then discussed the Tenth Circuit's treatment of *Mezei*, finding that although the Tenth Circuit's decision in *Rodriguez-Fernandez* suggests that the United States cannot indefinitely detain aliens without running afoul of the Due Process Clause, the Tenth Circuit, after that decision, has still relied on *Mezei's* statement that arriving aliens enjoy only the

14

process accorded to them by Congress. *Id*. at *3 (citing *Rodriguez-Fernandez v. Wilkinson*, 654 F.2d 1382 (10th Cir. 1981)). In *Sierra v. INS*, the Tenth Circuit rejected Sierra's procedural due process challenge, stating:

> Although he has been physically present in the United States . . . Sierra is "legally considered to be detained at the border and hence as never having effected entry into this country." The due Process Clause does not provide him a liberty interest in being released on parole. Ordinarily, then, "[w]hatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned."

*Id*. (quoting *Sierra*, 258 F.3d at 1218) (citation omitted). The Tenth Circuit distinguished *Rodriguez-Fernandez* in a footnote, stating that "[*Sierra*] did not involve, and we do not address, a substantive due[-]process challenge to congressional legislation." *Id*. (citing *Sierra*, 258 F.3d at 1218, n.3). Based on this case law, the magistrate judge concluded that "an arriving alien has a Fifth Amendment 'substantive[ ]due-process right to (at least) be free from certain abuses while detained. However, an arriving alien has a procedural[ ]due-process right only to the process accorded to her by Congress.'" *Id*. at *4.

The magistrate judge then construed the petition as challenging petitioner's detention on procedural due process grounds and recommended that the court reject her challenge because the relevant statutes required neither her release nor a bond hearing. *Id*. The magistrate judge further recommended that even if Petitioner had raised a substantive due-process challenge, the Court should reject it because Petitioner's case is readily distinguishable from *Rodriguez-Fernandez* because she will not be detained indefinitely. *Id*. In *Rodriguez-Fernandez*, because petitioner's home country of Cuba would not accept him, his detention became indefinite. *Id*. at *3.

The district court in *Gonzalez Aguilar* adopted the magistrate judge's PFRD, overruling petitioner's objections. *Id*. at *5–6 (finding that the Tenth Circuit later recognized that "any discussion of the constitutionality of indefinite detention in *Rodriguez-Fernandez* is *dicta* and not binding.") (citing *Ho v. Greene*, 204 F.3d 1045, 1057 (10th Cir. 2000), *overruling in part on other grounds recognized by Riley v. INS*, 310 F.3d 1253 (10th Cir. 2002)). The court noted the statement in *Rodriguez-Fernandez* that "Congress could not order the killing of Rodriguez-Fernandez and others in his status on the ground that Cuba could not take them back," and found that:

> Unlike the hypothetical substantive due-process case of the United States' executing an alien because it could not remove him, *Sierra*, like the instant case, involved a procedural due-process challenge to the decision to continue to detain an arriving alien. . . . As Sierra received the process outlined by the relevant parole statutes, the Tenth Circuit rejected his challenge to his detention under the Due Process Clause. . . . *Sierra*, rather than enlarging *Rodriguez-Fernandez*'s dicta, narrowed it. It stated that *Mezie*'s rule "applies to procedural due[-]process challenges," but not substantive due-process claims. . . . *Rodriguez-Fernandez*'s warning about broadly interpreting *Mezei* arose in the context of substantive due-process claims—where the government could severely restrict life or liberty.

*Id*. at *6 (internal citations omitted).

Petitioner has failed to show that he will be detained indefinitely. "Petitioner's detention will end either when the government grants [him] asylum or when it removes [him]." *Id*. at *7. Petitioner acknowledges that his removal proceedings will eventually end. (Doc. 10, at 7.) However, Petitioner argues that there may be a delay in his removal if a final order of removal is entered, noting that Cuba has closed its borders to international flights due to the COVID-19 pandemic. Upon the entry of a final removal order, the matter enters the "removal period," and

the statutory authority for detention shifts to 8 U.S.C. § 1231. However, Petitioner's post-removal detention is not properly before the Court and this argument is premature.

Petitioner cites case law from other jurisdictions finding in favor of an arriving alien's due process claims. "Though some courts have so held, numerous other courts disagree, including the Supreme Court in *Mezei* and *Knauff*." *Gonzalez Aguilar*, 2020 WL 1429673 at *7 (citing cases in disagreement and finding that "[a]t most, Petitioner can show that courts sharply disagree about the reach of the Due Process Clause as applied to arriving aliens."). This Court must follow the guidance from the Tenth Circuit and is persuaded by the analysis in *Gonzalez Aguilar*. Thus, the applicable statutory process shapes Petitioner's procedural due-process rights and Petitioner has no statutory right to release or a bond hearing. *Id.*

**IT IS THEREFORE ORDERED BY THE COURT** that the petition is **denied.**

**IT IS SO ORDERED**.

**Dated June 24, 2020, in Kansas City, Kansas.**

<u>S/ John W. Lungstrum</u>
**JOHN W. LUNGSTRUM**
**UNITED STATES DISTRICT JUDGE**